IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

United States District Court
Southern District of Texas
FILED

MAR 0 9 2009

Michael N. Milby, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <br> ex rel. BRUCE MOILAN and <br> STATE OF TEXAS ex rel. <br> BRUCE MOILAN | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No. <br> M-05-CV-263 |
| Plaintiffs | ) <br> ) <br> ) | **FILED <u>EX PARTE</u>** <br> **AND UNDER SEAL** |
| v. | ) <br> ) | |
| MCALLEN HOSPITALS, L.P. d/b/a <br> SOUTH TEXAS HEALTH SYSTEM, et al <br> Defendants. | ) <br> ) | **Jury Demanded** |

## SECOND AMENDED FALSE CLAIMS ACT COMPLAINT

### INTRODUCTION

1.     BRUCE MOILAN ("Relator") brings this action on behalf of the UNITED STATES

OF AMERICA against MCALLEN HOSPITALS, L.P. d/b/a SOUTH TEXAS HEALTH SYSTEM

(hereinafter sometimes referred to as "STHS"), UHS OF DELAWARE, INC., and UNIVERSAL

HEALTH SERVICES, INC., and all other acute care hospitals that are subsidiaries of UNIVERSAL

HEALTH SERVICES, INC. as set forth in paragraph 17 of this complaint. Relator sues Defendants

for treble damages and civil penalties arising from the Defendants' conduct in violation of the

Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA"). The violations arise out of

requests for payment by Medicare,  Medicaid, and other government agencies and programs

(hereinafter, collectively  the "Government Healthcare Programs") based on false claims.

2.     This action is also brought on behalf of the State of Texas (pursuant to The Texas

Medicaid Fraud Prevention Law, TEX.  HUM. RES. CODE §§36.001 - .132).

3.     Relator also brings actions for his wrongful termination under the whistleblower retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3730(h) and the Texas Medicaid Fraud Prevention Law, TEX. HUM. RES. CODE § 36.115.

4.     This Complaint describes Defendants' practices of inducing some doctors to make patient referrals by violating the Federal Fraud and Abuse Anti-Kickback and/or the Prohibited Referral Provisions of 42 U.S.C. §§1320a-7b and 42 U.S.C. §1395nn (hereinafter referred to as the Anti-kickback Law and Stark Law respectively). These practices include, but are not limited to, payments based upon phony leases, and the provision of office space, renovations, equipment, furniture, housekeeping services, office supplies, copy and fax machines, telephone, utility and transcription services to referring physicians for free or less than fair market value. They also include the provision of phony or excessive compensation for medical directorships, interest free loans/forgiveness of debts, illegal recruitment arrangements and improper discounts which represented additional financial windfalls to physicians locking in hospital referrals.

5.     Defendants also inflated and falsely claimed statements of expenses in the hospitals' filed cost reports including, but not limited to, the following: falsely claimed depreciation costs to cost-based units; capital equipment used in physician offices which were not related to hospital patient care; falsely claimed medical director fees which were not necessary or reasonable; costs from other cost centers shifted to cost-reimbursed cost centers; and/or failing to account for rebates.

6.     As required by the FCA, 31 U.S.C. § 3730(a)(2), the Relator has provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Texas, simultaneous with and/or prior to the filing of this Complaint, a statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence known to Relator at the time of his filing, establishing the existence of the

2

Defendants' legal responsibility for those false claims. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and to the United States Attorney in their capacity as potential co-counsel in the litigation, the Relator understands this disclosure to be confidential.

7.      Relator is informed and believes that the false claims described herein including violations of Stark Law, Anti-kickback law, and falsely claimed expenses in the hospitals' filed cost reports began at least 10 (ten) years before the filing of Relator's initial Complaint, and some continue to date.

8.      Relator brings this action based on his direct knowledge and also on information and belief. None of the actionable allegations set forth in this Complaint are based on a public disclosure as set forth in 31 U.S.C. §3730(e)(4). Notwithstanding same, Relator is an original source of the facts alleged in this Complaint.

9.      At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment. The policies and practices alleged in this complaint were, on information and belief, set or ratified at the highest corporate levels of Defendants.

10.     As may be required by the Texas Medicaid Fraud Prevention Act the Relator has provided to the appropriate officials of Texas, simultaneous and/or prior to the filing of this Complaint, a statement of all material evidence and information ("Disclosure Statement") related to this Complaint, as applicable. This "Disclosure Statement" is supported by material evidence known to the Relator at the time of the filing of this Complaint, establishing the existence of Defendants' false claims. Because this Disclosure Statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the state agencies in

3

their capacity as potential co-counsel in the litigation, the Relator understand this disclosure to be confidential.

## JURISDICTION AND VENUE

11.     The acts proscribed by 31 U.S.C. S 3729 et seq. and complained of herein occurred in part in the Southern District of Texas, and Defendants, STHS and UNIVERSAL HEALTH SERVICES, INC., among others, do business in the Southern District of Texas.   Therefore, this Court has jurisdiction over this case and all Defendants pursuant to 31 U.S.C.  3732 (a), as well as under 28 U.S.C. § 1345. This Court has pendent jurisdiction over this case for the claims brought on behalf of the State of Texas (referenced in paragraph 2) pursuant to 31 U.S.C. §3732(b), inasmuch as recovery is sought on behalf of said state which arises from the same transactions and occurrences as the claim brought on behalf of the United States.

12.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. §3729 et. seq. and also proper pursuant to U.S.C. §1391(b) because the claims that this Complaint describes arose in this District. Further some of the Defendants and the corporate parent of all of the Defendants, does business in this District.

## PARTIES

13.     Relator, BRUCE MOILAN, is a resident of Texas.  He has been employed by Defendants, STHS and UNIVERSAL HEALTH SERVICES, INC., since 1999.

14.     Defendant UNIVERSAL HEALTH SERVICES, INC. (hereinafter "UNIVERSAL") is a healthcare management company engaged in the business of owning and operating behavioral health facilities, acute care hospitals, ambulatory surgery and radiation centers nationwide.  It is incorporated in the State of Delaware, its corporate headquarters are located in King of Prussia, PA

and it does business throughout the United States. UNIVERSAL is the parent company to all other defendants named herein. An allegation against any Defendant herein is intended to include UNIVERSAL as a responsible party, inasmuch as UNIVERSAL is the parent company integrally involved in each of the Defendant hospital's operations.

15.     Defendant, UHS OF DELAWARE, INC. d/b/a Universal Health Services of Delaware, Inc., is a wholly-owned subsidiary of UNIVERSAL. It is a Delaware corporation with its corporate headquarters located in King of Prussia, PA and does business throughout the United States.

16.     Defendant MCALLEN HOSPITALS, L.P. d/b/a South Texas Health System "(STHS)", is a Delaware limited partnership and wholly-owned subsidiary of UNIVERSAL. STHS owns and/or operates multiple healthcare facilities in the McAllen and Edinburg markets, and does business as South Texas Health System, McAllen Heart Hospital, McAllen Medical Center (MMC), Edinburg Regional Medical Center, South Texas Behavioral Health Center, The Rehabilitation Pavilion or UHS Rehabilitation Pavilion or South Texas Rehabilitation Pavilion, and Edinburg Children's Hospital. Reference to "STHS" means one or more of the hospitals listed in this paragraph.

17.     The following entities are intended to include all subsidiaries of UNIVERSAL that are acute-care hospitals: Defendant, Aiken Regional Medical Centers, Inc. is a South Carolina corporation which owns and /or operates a 230 bed hospital located in Aiken, South Carolina; Defendant, Auburn Regional Medical Center, Inc. is a Washington corporation which owns and/or operates a 149 bed hospital in Auburn, Washington; Defendant, Central Montgomery Medical Center, LLC is a Pennsylvania corporation which owns and/or operates a 125 bed hospital located in Landsdale, Pennsylvania; Defendant UHS - Corona, Inc. d/b/a Corona Regional Medical Center,

is a Delaware corporation which owns and/or operates a 228 bed hospital located in Corona, California; Defendant Valley Health Systems, Inc. owns and/or operates the following hospitals located in Las Vegas, Nevada, Desert Springs Hospital Medical Center, Spring Valley Hospital Medical Center,  Defendant, Summerlin Hospital Medical Center, LLC (a Delaware Corporation) and Defendant, Valley Hospital Medical Center, Inc. (a Nevada Corporation); Defendant Laredo Regional Medical Center L.P. and/or Defendant Laredo Regional, Inc d/b/a Doctors Hospital of Laredo are Delaware corporations which own and/or operate a 180 bed hospital located in Laredo Texas; Defendant, Fort Duncan Medical Center, L.P. is a Delaware corporation which owns and/or operates a 104 bed hospital located in Eagle Pass, Texas; Defendant, Southwest Healthcare Systems, Inc. owns and/or operates, a 122 bed hospital located in Wildomar California and also Rancho Springs, a 96 bed hospital located in Murrieta, California; Defendant, Manatee Memorial Hospital LP., is a Delaware Limited Partnership which does business as, and owns and/or operates Lakewood Ranch Medical Center (a 120 bed facility) as well as, Manatee Memorial Hospital (a 319 bed facility), both located in Bradenton, Florida; Defendant, Lancaster Hospital Corporation, is a 117 bed hospital located in Lancaster, California; Defendant, Northern Nevada Medical Center L.P. is a Delaware limited partnership with a 100 bed hospital located in Sparks, Nevada; Defendant, Northwest Texas Healthcare System, Inc. is a Texas Corporation with a 489 bed hospital located in Amarillo, Texas; Defendant, UHS Of Oklahoma, Inc., d/b/a St. Mary's Regional Medical Center is a Oklahoma corporation which owns and/or operates a 245 bed hospital located in Enid, Oklahoma; Defendant UHS of Texoma, Inc. d/b/a Texoma Medical Center is a Delaware corporation which owns and/or operates a 234 bed hospital located in Denison, Texas; the Defendant, District Hospital Partners, L.P. d/b/a The George Washington University Hospital UHS is a District of Columbia corporation which owns and/or operates with 371 bed hospital located in Washington, D.C.;

Defendant, Wellington Regional Medical Center, Inc. is a Florida corporation which owns and/or operates a 143 bed hospital located in West Palm Beach, Florida; Pendleton Methodist Hospital, L.L.C. d/b/a Pendleton Methodist Hospital is a Delaware Limited Liability company that formerly owned and operated an acute care hospital in New Orleans, LA; and Chalmette Medical Center, Inc. d/b/a Chalmette Medical Center is a Louisiana Corporation that formerly owned and operated as an acute care hospital located in New Orleans, LA.

18.     The term "Defendants" in this Complaint refers to the entities set forth in paragraphs 14-16 of this Complaint, and the term "Defendant Subsidiaries" refers to the entities set forth in paragraph 17 of this Complaint.

## THE THREE MAJOR FEDERAL HEALTHCARE PROGRAMS

19.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §1395 to 1395ccc. There are two general components to the Medicare program, Part A and Part B.

20.     The Medicaid program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. Though federally created, the Medicaid program is a joint federal-state program in which the United States provides a significant share of the funding for the program.

21.     TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TriCare contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted by Defendants.

7

## LAWS

22.     The False Claims Act provides, in pertinent part that:

>       (a) Any person who (1) knowingly presents, or causes to be
>       presented, to an officer or employee of the United States Government
>       or a member of the Armed Forces of the United States a false or
>       fraudulent claim for payment or approval; (2) knowingly makes, uses,
>       or causes to be made or used, a false record or statement to get a false
>       or fraudulent claim paid or approved by the Government; (3)
>       conspires to defraud the Government by getting a false or fraudulent
>       claim paid or approved by the Government;
>                                   * * *
>
>       is liable to the United States Government for a civil penalty of not
>       less than $5,000 and not more than $10,000, plus 3 times the amount
>       of damages which the Government sustains because of the act of that
>       person.

31 U.S.C. § 3729.

23.     The False Claims Act is the government's primary tool to recover losses due to fraud

and abuse by those seeking payment from the United States. *See* S. Rep. No. 345, 99 Cong., 2nd

Sess. at 2 (1986) *reprinted in* 1986 U.S.C.C.A.N 5266.

24.     The Anti-kickback Statute prohibits any person or entity from making or accepting

payment to induce or reward any person for referring, recommending or arranging for federally-

funded medical services, including services provided under the Medicare, Medicaid and TRICARE

programs. In pertinent part, the statute states:

>       Whoever knowingly and willfully offers or pays [or solicits or
>       receives] any remuneration (including any kickback, bribe, or rebate)
>       directly or indirectly, overtly or covertly, in cash or in kind to any
>       person to induce such person to refer an individual to a person for the
>       furnishing or arranging for the furnishing of any item or service for
>       which payment may be made in whole or in part under a Federal
>       health care program, or to purchase, lease, order or arrange for or
>       recommend purchasing, leasing, or ordering any good, facility,
>       service, or item for which payment may be made in whole or in part
>       under a Federal health care program, shall be guilty of a felony.

42 U.S.C. §1320a-7b(b).

25.     The "Stark" statute, 42 U.S.C. §1395nn, is also known as the Physician Self-Referral Law. The regulations are at 42 C.F.R. § 411.350 *et. seq.* Under Stark, if a physician (or immediate family member) has a direct or indirect financial relationship (ownership or compensation) with an entity that provides any of the health services identified in the statute ("designated health services" or "DHS"),[1] the physician cannot refer patients to the entity for DHS and the entity cannot submit a claim to CMS for such DHS unless the financial relationship fits in a statutory or regulatory exception.

26.     Liability under Stark involves three elements: (1) a physician refers a patient to an entity for a designated health service; (2) the physician and the entity have a financial relationship; and (3) none of the Stark exceptions apply.

27.     The case law is well-established, including that of the Fifth Circuit, that the submission of claims in violation of the Stark Law can give rise to False Claims Act liability. Every UB-92, CMS-1450, CMS-1500 and other claim form submitted to Government Healthcare Programs by Defendants for services rendered to patients who were unlawfully referred in violation of the Stark Law and/or Anti-Kickback law were also false.

## ALLEGATIONS

28.     Government Healthcare Programs depend on physicians and other health care professionals to exercise independent judgment in the best interests of patients. Financial incentives tied to referrals[2] have a tendency to corrupt the health care delivery system in ways that harm the

---

[1] All hospital services (inpatient and outpatient) are designated health services.

[2] In general, hospitals are prohibited from offering any type of remuneration to physicians to encourage referrals to a particular hospital if payment for those patients' procedures comes from federal healthcare programs. 42 U.S.C. §1320a-7b(b)(1) (2000)( detailing provisions relating to Medicare fraud and financial misconduct; see generally 42 U.S.C. §1395nn (2000) (explaining the laws governing physician ownership and referrals); 42 U.S.C. §1320a-7b(a) (enumerating criminal penalties for acts involving federal healthcare programs).

federal programs and their beneficiaries. For example, corruption of medical decision-making can result when a physician refers a patient to a provider on the basis of the physician's financial self-interest instead of the patient's best interests. Unfair competition can result when honest providers have difficulty competing with unscrupulous providers who pay to generate business. This results in systemic corruption of federal healthcare programs and defrauding of the public.

29.    The Relator, BRUCE MOILAN, SR., witnessed what he perceived to be a pattern and practice within Defendants (in particular STHS and its corporate parent, UNIVERSAL) of inducing doctors to make patient referrals by violating the Federal Fraud and Abuse Anti-Kickback and Prohibited Referral Provisions of 42 U.S.C. §1320a-7b and 42 U.S.C. §1395nn, respectively. This fraudulent scheme has resulted in false certifications of compliance, thereby tainting all resulting claims submitted to Government Healthcare Programs.[3]

30.    From before and including 1995 to the present, Defendants engaged in financial relationships with physicians by paying remuneration to such physicians; unlawfully accepting those physicians' patient referrals, then unlawfully billing Medicare and Medicaid for designated health services rendered to those patients. Defendants knowingly paid remuneration to the physicians with the expectation they would derive a greater benefit from patient referrals. Defendants took into account the value and volume of referrals to it. As long as referrals reached a certain level, or were maintained at a certain level, remuneration and other consideration was furnished to physicians, including loans that were forgiven.

31.    Also triggering False Claims Act liability, the Defendants named herein that comprise all UNIVERSAL acute care hospitals, ("Defendant Subsidiaries") submitted (and

---

[3]Texas has adopted substantially similar laws that apply whether or not federal payments are involved. See, e.g. Texas Occ. Code Ann. 102.001(2003).

UNIVERSAL helped to prepare) cost reports every year expressly certifying that they were in compliance with all applicable laws and regulations, when in fact they were violating the Stark Law, the Anti-kickback law, and/or overstating their expenses by failing to include rebates received from vendors as a credit to the applicable cost center. These same Defendant Subsidiaries also submitted false outpatient and inpatient claims to Government Healthcare programs by billing for drug eluted stents when none were delivered/used in the procedure on the patient.  The certifications on the cost reports were false on their face and were made with the requisite knowledge that they were false.

## Stark & Anti-Kickback Violations

32.     Examples of Stark and/or Anti-kickback violations due to free equipment, furniture, supplies and other consideration furnished to physicians include, but are not limited to, the following:

a.     Dr. Eugenio Galindo, M.D.  has received many benefits including office space, housekeeping services, supplies, software, office machines and equipment, all provided for free or below fair market value.   Moreover, since June 2003, a condominium unit owned by Dr. Galindo has been leased by STHS for approximately $8000 a month.  It  remains to date, a shell structure with a dirt floor, not related to patient care. At the same time, Dr. Galindo has made significant referrals to STHS's  X-ray department, laboratories, same day surgeries and respiratory therapy.

b.     Dr. Jose Igoa, M.D. has been the Medical Director at McAllen Medical Behavioral Health Center and has given the hospital the majority of its census there.   Dr. Igoa's patient referrals to STHS included referrals for laboratory tests, group sessions, alcohol and drug testing, and out patient counseling. In addition, Dr. Igoa's referrals involve the McAllen Medical Center pharmacy as a majority of his patients get drug therapy.  STHS supplied copy machines, fax

machines, telephone service, utilities, transcription services and furniture to Dr. Igoa. Further, Dr. Igoa did not pay any (or very little) rent at either of his two private medical offices since at least 1996.

        c.      Dr. Nashin Manohar M.D. was recruited and arrived in 2004. Upon his arrival, STHS purchased an EMG (to conduct electromyography nerve stimulator tests) with an approximate value of $24,000 and a Sierra wave 4 channel and accessories valued at approximately $21,500.00. Although the EMG is on STHS' books as a lease payment, the real agreement is that STHS will give it to Dr. Manohar to use until it fully depreciates, and then give it to him. Dr. Manohar refers patients for testing to the hospital.

        d.      Dr. Linda Villarreal, M.D. and STHS have entered into renovation/lease agreements that inured to Dr. Villarreal's benefit, in exchange for patient referrals.

        e.      Dr. Harish Koolwal, M.D. has enjoyed the use of free or greatly discounted use of the office equipment, office machines, software and office space from approximately 1999 until January 2005. In 2004 and 2005, the Relator inventoried his office in McAllen Medical Center and found that most if not all equipment is/was paid for by STHS.

        f.      Dr. Robert Pardo, M.D. received an EKG machine in exchange for sending his patients to McAllen Medical Center.

        g.      Dr. Lester Dyke received free use of the STHS billing system for years.

        h.      To increase or maintain levels of referrals, STHS paid for employees of physicians. For instance, the sum of $95,310 was paid in 1998 which "represents a monthly stipend to Dr. Gomez for employees of Dr. Gomez used in the vascular lab at MMC".

      33.      Examples of Stark and/or Anti-kickback violations due to write-off of physician loans include, but are not limited to, the following:

a.      Valley Heart Consultants in the approximate amount of $150,000 original loan in 2000 was originally "for office expenses," and was written off.

b.      Dr. Nguyen, has had a balance since 2002 of $146,972 arising out of an original income guarantee dated 1/1/93. The original amount paid to Dr. Nguyen  under the guarantee was $374,273. Defendants wrote off the $227,301 in 1995, which thereafter left the uncollected $147,000, which was written off.

c.      Dr. M Yazji as early as 2002 had a balance of over $400,000 for income guarantees of 4 doctors in Dr. Yazji's practice, which was written off.

d.      Outstanding debt on loans made to physicians have been written off if the physician "maintained an office in the McAllen Office Building" adjacent to the hospital. The office building was owned by a group of physicians known as McAllen Associates and STHS felt obligated to help them keep it leased.

e.      It should be noted that in general there may have been steps to correct some of the write-offs after the federal investigation began.

34.      Examples of Stark and/or Kickback violations due to providing physicians with marketing support for which substantial payments were made to third party vendors include, but are not limited to, the following:

a.      Dr. Victor Villarreal was provided with newspaper advertising because "he and his brother, Dan Villarreal are loyal physicians at MMC (only admit at MMC). They would welcome an ad as they feel their patient population has diminished somewhat."

b.      Harmelin Media invoices were paid in conjunction with 2001 advertising for various physicians including Dr. Miguel and Dr. Fernandez.

c.      Payments were made for an advertisement for Dr. Nelson Spinetti in the

13

amount of $2,500.

        d.     Payments were made in 2001 for Dr. Alberto Francis in the amount of $5,140

for billboard advertising. Upon information and belief, the payment was allocated into two separate

cost centers: 6157.07 and 6026.07 on the FY 2001 cost report.

        e.     In 2001, a "one time payment"of $25,000 was paid for: "Marketing support

to produce announcements for medical/local community, newspaper announcements; open house

to introduce new physician." The purpose was "to assist Dr. Jorge L. Kutagata . . . to employ Dr.

Desmond O. Ikondu, MD," both of Rainbow Pediatric Clinic.

        35.     Examples of Stark and/or Anti-kickback Violations due to providing physicians with

lavish entertainment in order to increase or maintain referrals include, but are not limited to, the

following::

        a.     Physicians were provided with premium San Antonio Spurs Tickets, at times

their hotel rooms and meals were provided for as well.

        b.     A corporation owned by Dr. Lester Dyke's wife called Bighorn Ranch was

paid the approximate amount of $20,000 each year, for "game hunt hunting privileges".

        c.     Physicians were entertained at Bighorn Ranch, which was viewed as "an

opportunity to reward our key customers and to enhance our physician relations."

       36.     Examples of Stark and/or kickback violations disguised as legitimate

employment/compensation agreements include, but are not limited to, the following:

        a.     Dr. Galindo has received a number of interest free loans and advances from

STHS. These amounts included one for approximately $8000 and the other for approximately

$500,000, for which he did not pay interest or penalties. Over the years, Dr. Galindo has received

medical directorship fees from STHS, which have been used to assist him to repay loans/advances

from STHS.

        b.      Dr. Jose Igoa has been the Medical Director at South Texas Behavioral Health Center and was paid a medical directorship fee.

        c.      Dr. Nashin Manohar has been the Medical Director at the South Texas Rehabilitation Pavilion.

        d.      Dr. Linda Villarreal has been a member of  the Board and a paid Medical Director at Edinburg Regional Medical Center. Dr. Villarreal used to be the Medical Director of the South Texas Rehabilitation Pavilion, before Dr. Villarreal came to Edinburg Regional Medical Center.

        e.      Beginning in approximately January, 2005, Dr. Koolwal was paid as the Medical Director of Edinburg Children's Hospital, although it did not open until 2006.  Dr. Koolwal has also been the Medical Director at the Cath Lab for Children in Edinburg Regional Medical Center.  Very few patients have been seen at that facility to date.

        f.      Dr. Manohar and his wife were paid close to $500,000 (including in-kind benefits) in some years, including 2005, in order to induce referrals.

        37.     Examples of  Stark and/or Anti-kickback violations disguised as legitimate recruitment arrangements include, but are not limited to, the following: As background, it should be noted that whenever a hospital furnishes remuneration to induce a doctor to relocate his practice to the hospital's service area, the physician is deemed to have a "financial relationship" with the hospital under the Stark law in the form of a "compensation agreement." 42 U.S.C. §1395nn(h)(1); 42 C.F.R. §§411.354(a), 411.354©).  Recruiting by hospitals and group practices strictly forbids the use of income guarantees that shift group practice overhead or expenses to the hospital *or any payment structure that otherwise transfers remuneration to the group practice.*  In other words, the

15

practitioner recruitment safe harbor does not protect "joint recruitment" arrangements between hospitals and other entities such as solo practitioners, group practices or managed care organizations pursuant to which the hospital makes payments directly or indirectly to the other entity or individual.

a.      Defendants utilized relocation agreements to bring relocated physicians into practices that already existed within the service area.  In addition to providing a guaranteed salary and overhead to the relocated physicians, the relocation agreements also sometimes provided the "host" physician practices with funds for tenant improvements and equipment purchases necessary to accommodate the relocated physicians.

b.      The relocation agreements were offered by Defendants primarily to benefit the existing host physician, rather than the relocated physicians.  For example, relocation agreements were often negotiated entirely between hospital representatives and the host physician and were signed by the relocated physician, upon information and belief, only after the final agreement had been reached.

c.      Monies paid under the relocation agreements to host physicians were often excessive or over-stated.  Also, certain tenant improvements claimed by the host physicians were not actually undertaken or if undertaken, were for the sole benefit of the physician.

d.      For example, Dr. Galindo employed Dr.  R. in 2001.  As part of the process, STHS contracted with Dr. Galindo to employ Dr.  R.  This two year contract included a net income guarantee which was paid directly to Dr. Galindo to pass through to Dr.  R.  The purpose of these and other agreements tied to "relocation" were for Dr. Galindo to refer business to STHS.

38.    Examples of  Stark violations and/or kickback violations disguised as appropriate lease transactions include, but are not limited to, the following: As background it should be noted that there was never legitimate reason for STHS to lease office space at physician - owned properties,

as there was always abundant office space available at the South Texas Rehabilitation Pavilion, Edinburg Regional Medical Center or in other available space controlled by STHS. Below are some of the arrangements:

a.     A lease at McAllen Cardiac Building owned by Dr. Hugo Blake and his associates wherein MMC's "leases" the first floor conference room located in the medical office building adjacent to the McAllen Heart Hospital for $3,670.30 per month (plus certain fees) for 5 years (2001-2006).

b.     A lease of Suite 200 in a building owned by Dr. Hugo Blake as his associates, for $4,837.00 per month, "for medical records." Defendants however, did not use the space; instead Dr. Blake used it for his private practice, rent free, from approximately 2003  until it was closed down in 2005.

c.     A lease between Dr. Allan Mercado, as lessor, and Edinburg Regional Medical Center, as lessee, for two years to "use the radiology and diagnostic configuration of that space for future development." STHS paid Dr. Mercado nearly $4,000.00 per month. The space was never fully utilized.

d.     A lease (or series of leases) between Edinburg Regional Medical Center and Edinburg Women's Clinic P.A., to lease Suite 106 in the latter's medical office building, for a total of $71,191.68 yearly. Upon information and belief, there was also a lease for suite 104 which remains unfinished and unused, although payment has been made regularly by Edinburgh Regional Medical Center.

e.     A three year lease agreement for STHS to pay $4,252.50 per month for part of Suite 201 from McAllen Heart Surgeons "for its [McAllen Heart Hospital] financial functions," yet plenty of other space was available for meetings matters at no cost to STHS.

17

f.     STHS has provided Dr. Igoa with multiple free office space, including build-outs, furniture and office equipment. From 2006 to date, he has been provided with free housekeeping and supplies for his office.

## Cost Reports

39.     Medicare Part A covers the cost of hospital services and related care, and reimburses hospitals for services provided to its beneficiaries by means of a prospective payment system ("PPS"). Medicare groups standardized medical codes for patients, diseases, and procedures into diagnostic related groups ("DRG") that provide the basis for PPS.

40.     Throughout the course of the fiscal year, hospitals submit claims to their assigned Fiscal Intermediaries ("FI") for Medicare reimbursement. (Generally, these claims are submitted based upon the number of discharged Medicare beneficiaries. 42 C.F.R. §§ 413.1, 413.60, 413.64.) To enable them to satisfy their operating need for cash, hospitals receive periodic interim payments based on hospital discharges. Within a specified time after the end of the fiscal year, hospitals submit a Form CMS-2552, "Hospital and Hospital Health Care Cost Report" (the "Cost Report") to their Fiscal Intermediary, setting out the costs they actually incurred. Based on these Cost Reports, the Fiscal Intermediary determines the correct amount of Medicare reimbursement for the cost year and either pays the hospitals any additional amounts due or bills the hospitals for excess interim payments, as appropriate. 42 C.F.R. §§ 405.1803, 413.20(b), 413.60 and 413.64(f)(1).

41.     Cost Reports filed on behalf of a hospital include a statement of the total costs expended by the hospital for each category of expense. The hospital arrives at the classification of these expenses by completing Worksheet A of the Cost Report, titled the "Reclassification and Adjustment of Trial Balance of Expenses." Worksheet A starts with the hospital's trial balance of

expenses. The hospital's trial balance should include all of the hospital's costs, whether they are allowable or unallowable for Medicare reimbursement purposes. The hospital then reclassifies its trial balance of expenses in accord with the Medicare statute, regulations and CMS program instructions. Next, a hospital makes certain adjustments on Worksheet A, also in accord with the Medicare statute, regulations and CMS program instructions, to separate out costs which are either allowable or not allowable for Medicare reimbursement purposes. Thus, Worksheet A consists of all of the hospital's reclassifications and adjustments of costs.

42.    Of great significance is that every hospital's Cost Report contains a "Certification," which must be signed by the chief administrator of the hospital or a responsible designee. For the years at issue in this case, the certification provision in the Cost Report required the responsible provider official to certify, in pertinent part, that:

> to the best of my knowledge and belief, it [the cost report] is a true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted.

> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

See Form CMS-2552; 42 C.F.R. § 413.24(f)(4)(iv).

43.    Hospitals which file their cost reports electronically are required to submit a paper certification to the Fiscal Intermediary, which must be signed and dated. 42 C.F.R. § 413.24(f)(4).

44.    For costs in a cost center to be reimbursable to a hospital, the costs must be related, directly or indirectly, to patient care in the health care facility. Therefore, where none of the costs in a cost center are related to a facility's patient care, the facility should properly establish a non-reimbursable cost center for such costs. 42 U.S.C. § 1395x(v)(1)(A); 42 C.F.R. § 413.9; PRM §§ 2328, 2302.8.

19

45.     The following examples are illustrative (but not exhaustive) of the types of inflated statements of expenses Defendants have made or caused to be made in the hospitals' filed cost reports (1998-present):

a.      Defendants falsely claimed or caused to be claimed depreciation costs for capital equipment which were not related to hospital patient care, because the equipment has been located in physicians' private offices.  When the equipment was purchased, the depreciation was charged to particular cost centers as reported on a monthly capital equipment report (using "TAMS" software), which data is eventually rolled into the yearly cost reports.  For instance, approximately $1.5 million yearly has improperly been on the STHS books and claimed as depreciation on STHS' hospital cost reports.

b.      STHS falsely claimed or caused to be claimed reimbursement of $8,000.00/month for lease payments to Dr. Galindo for an office owned by Dr. Galindo, that Defendants knew was not necessary for STHS hospital use and/or would be used for a non-reimbursable activity.

c.      Defendants falsely claimed or caused to be claimed certain medical staff support costs which they knew were not allowable, because the medical staff worked solely in physician practices. This includes the provision by STHS of medical staff for Dr. Galindo.

d.      Defendants falsely claimed or caused to be claimed medical director fees for certain physicians, which were not necessary or reasonable, and which also were provided in violation of the Stark and/or Anti-kickback Laws.

e.      Defendants falsely claimed or caused to be claimed costs to Rehabilitation and

Psychiatric units.[4] For instance, costs improperly shifted to a Psychiatric Unit include approximately $179,904.00 worth of equipment which was purchased for the Psychiatric Unit in the Rehabilitation Pavilion, which was closed after 6 months and returned to its original use as a skilled nursing unit. Upon information and belief, depreciation was taken on the equipment for more than 6 months. Architect/construction fees of over $500,000.00 were also, upon information and belief, charged/depreciated to the 2003 fiscal year, yet really inured to the benefit of the SNF unit.  Also, the Defendants falsely failed to include an allocation statistic for the provision of free space provided for physicians, including at STHS hospitals where physicians were provided with free space to treat their private practice/non-hospital patients.  For instance, at least one physician occupies space on the first floor of the hospital, rent free.      At the South Texas Behavioral Health Center, approximately 2,000 square feet was used (largely) rent free by physicians.  Maintenance and housekeeping was also provided free to the physicians, yet charged to the Psychiatric Unit.

    f.  STHS falsely claimed costs for a Transplant Center from 2002-2005 as follows:

    1.  $150,000 per year for 2 years directly to Daniel McLean, MD plus $65,000 to the Renal Transplant Program at Methodist Transplant Service in San Antonio, where Daniel McLean, MD had a two year fellowship;

    2.  $3,103.04 per month for the lease of 2,406 sq ft of office space  from McAllen Associates.

    3.  $7,500 per month payment to Daniel P. McLean MD as Surgical Director, Transplant Program.

---

[4]The Rehabilitation Unit and Psychiatric Unit were reimbursed through the hospital cost report on the basis of cost up to the year 2000 and thereafter have been reimbursed in part based upon cost. Cost-based units such as Rehabilitation and Psychiatric  have been in the process of being phased out.

4.      Payment to Lisa Donaldson as RN, FA to assist Daniel McLean MD in his medical practice.

g.      Defendants falsely charged costs to Rehabilitation cost centers that were unnecessary or not related to patient care, including, but not limited to, the following:

1.      At STHS, costs to build and re-build the rehabilitation unit in various buildings.

2.      At STHS, costs for property owned by Dr. Linda Villarreal, including payments to improve her property for landscaping, air conditioning, carpet, painting, electrical and furniture.

3.      At STHS, costs for artwork and furniture furnished by Helle's Fine Furnishings and Draperies, some of which was not utilized in the Rehabilitation center and most of which was used less than a year.

4.      At STHS, costs for novelty items purchased from C.H. Harden Junior Enterprises Inc. which were not all used by the Rehabilitation department, and in any case, are hospital marketing items not properly chargeable under the cost report system, and certainly not chargeable to the rehab unit. Items included sun visors, auto travel mugs, fanny packs, and key chain bottle openers.

h.      Defendants falsely claimed expenses associated with the provision of Kickback and Stark violations described herein.   The monetary and in-kind benefits paid to the physicians were not related to the care of Defendants' patients, and the payments were made with a common functional purpose – to receive referrals, said referrals internally and separately tracked, accumulated and accounted for within Defendants.

46.     As set forth above, Defendants knowingly submitted or caused to be submitted

untruthful, incorrect or incomplete hospital cost reports to Government Healthcare Programs containing false certifications that the cost reports were true, correct and complete, in violation of 31 U.S.C. § 3729. Defendants' false certifications of truthfulness, correctness and accuracy damaged the United States because they allowed Defendants to receive reimbursement in excess of the amount to which they were entitled.

### Vendor Rebates

47.     A vendor rebate is a retroactive discount, allowance, or refund given to a health care provider after the full list price has been paid for a product or a service. Rebates are usually paid quarterly or annually and are usually dependent on achieving a specific purchasing volume. A rebate is paid directly to a provider (e.g., a hospital) or to a nonprovider (e.g., a group purchasing organization or distributor).

48.     Federal regulations (42 CFR § 413.98) state that rebates are reductions in the cost of goods or services purchased and are not income. The Centers for Medicare & Medicaid Services (CMS) Provider Reimbursement Manual (part 1, chapter 8) requires hospitals and other health care providers to report all discounts on their Medicare cost reports. The cost report contains provider information, costs and charges by cost center (in total and for Medicare), Medicare settlement data, and financial statement data. A cost center is generally an organizational unit having a common functional purpose for which direct and indirect costs are accumulated, allocated, and apportioned. Providers must reduce previously reported Medicare costs when they receive rebates.

49.     Each year, Defendants purchase (in total) hundreds of millions of dollars worth of devices from multiple vendors, which device costs are typically passed through and reimbursed as a separate charge to Medicare and other federal healthcare programs. These include but are not limited to, stents, pacemakers, ICD's, orthopedic implants, heart failure devices, and

pharmaceuticals.

50.     Each year, most if not all of these same vendors have been paying rebates on the devices back to UNIVERSAL and/or the other Defendants.

51.     Typically, rebate checks have been inappropriately deposited and credited to an account on the UNIVERSAL home office level, and not credited to the appropriate cost center at the local hospital provider level in which the initial purchase of the devices were made. Accordingly, costs have been overstated (due to lack of rebate credits on the hospital cost reports) in each Defendant cost report, typically in the surgery (and related) cost centers.

52.     This problem was discovered two years ago and it still is not reconciled throughout the Defendants' systems, although the failure to credit the rebates on the local level to the appropriate cost center in the hospital cost reports have damaged the United States in tens of millions of dollars.

53.     Relator knows that rebates were not credited to the cost reports because there was supposed to be an interoffice transfer between UNIVERSAL and the "Defendant Subsidiaries," and that has not yet occurred.

### False Claims for Drug Eluting Stents

54.     A stent is a small, lattice-shaped, metal tube that is inserted permanently into an artery. The stent helps hold open an artery so that blood can flow through it.

55.     Drug-eluting stents are stents that contain drugs that potentially reduce the chance the arteries will become blocked again.

56.     At all material times, only two drug-eluting stents, the Cordis CYPHER™ sirolimus-eluting stent and the Boston Scientific TAXUS™ paclitaxel-eluting stent system, have received FDA approval for sale in the United States (the Cypher stent in April 2003; the Taxus stent was approved a year later in March 2004).

57.     Effective April 1, 2003 CMS created two new, higher paying Diagnosis Related Groups (DRGs 526 and 527) for hospital inpatients that are specific to drug-eluting coronary stents.

58.     Also after April 1, 2003, hospitals billing for drug-eluting stents for outpatients were to use APC 0656.

59.     Two new HCPCS codes, G0290 and G0291, were created to describe transcatheter placement of a drug eluting intracoronary stent(s), percutaneous, with or without other therapeutic intervention, any method.   Code G0290 describes a single vessel and G0291 is an add-on code describing each additional vessel.

60.     HCPCS Codes G0290 and G0291 were assigned to APC 0656, Transcatheter Placement of Drug-Eluting Coronary Stents, with a status indicator of T under the outpatient PPS, so hospitals can bill a separate code for each vessel in which a stent is placed.

61.     CMS also indicated that alternatively, hospitals could bill separately for the stent using an appropriate Revenue Code, making certain that the charge for the G0290 and G0291 did not include the charge for the stent. Payment for placement of the stents, and the stents, themselves, are made under APC 0656 for outpatients.

62.     As of January 1, 2004, CMS reinstituted C-codes for devices for cost reporting and cost tracking purposes. Therefore, hospitals have had a third option to report charges for drug eluting stents. That is, a hospital could report HCPCS code C1874, "Stent, coated/covered, with delivery system" with an appropriate Revenue Code to report their charge for drug eluting coronary stents.

63.     All or most Defendant Subsidiaries that are UNIVERSAL acute care hospitals have made claims for Drug Eluted Stents that never were implanted. Defendants have submitted claims with inappropriate codes, including appropriate Revenue Codes and HCPCS codes, and if inpatient, DRG Codes, resulting in Defendant Subsidiaries being paid for stents when stents were not used in

the procedure.

64.     Defendants in short, charged for more stents than they purchased. Hospitals confirmed to have submitted false claims are: Lancaster, St. Mary's, Aiken, Auburn, Chalmette/Methodist, Desert Springs, George Washington, Manatee/Lakewood Ranch, McAllen/Edinburg, Northwest Texas, Spring Valley, Summerlin, and Valley UHS Hospitals.

65.     Defendants submitted false claims in the approximate amount of $56 Million for FY 2004, and upon information and belief, similar overcharges in surrounding years.

## COUNT I- FALSE CLAIMS ACT

66.     Relator realleges and incorporates by reference paragraphs 1-65 as though fully set forth herein.

67.     This is a claim by Relator, on behalf of The UNITED STATES OF AMERICA, for treble damages and penalties under the FCA, 31 U.S.C. 3729-3733 against Defendants and Defendant Subsidiaries for knowingly causing to be presented false claims to Government Healthcare Programs.  From in or about 1995 through present in the Southern District of Texas and elsewhere throughout the United States, Defendants and Defendant Subsidiaries have knowingly and willfully presented and caused to be presented false claims.

68.     Defendants and Defendant Subsidiaries have presented and caused to be presented claims for payment to the Government Healthcare Programs, knowing such claims were false.

WHEREFORE, Relator respectfully requests this Court to enter judgment against Defendants and Defendant Subsidiaries, as follows:

(a)     That the U.S. be awarded damages in the amount of three times the damages sustained by the U.S. because of the false claims alleged within this Complaint, as the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides.

(b)     That civil penalties of $11,000 be imposed for each and every false claim that Defendants caused to be presented to the Government Healthcare Programs;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorney's fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d)     That the Relator be awarded the maximum amount allowed pursuant the False Claims Act;

(e)     That this Court award such other and further relief as it deems proper.

## COUNT II
## TEXAS FALSE CLAIMS ACT

69.     Relator repeats and realleges each allegation contained in paragraphs 1 through 65 above as if fully set forth herein.

70.     Medicaid is jointly financed by the federal government and the states.  The Secretary of the U.S. Department of Health and Human Services determines each state's federal share of most healthcare costs using a formula based on average state per capita income compared to the U.S. average.  These matching rates are updated every year to reflect changes in average income.

71.     The matching rate of the State of Texas for FY 2004 was 60.22%; that is, the state must pay 39.78% of most Medicaid costs.  The matching rate of the State of Texas in previous years has also been roughly 60%.

72.     The Texas Health and Human Services Commission administers the Texas Medicaid Program.

73.     This *qui tam* action is also brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

74.     V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

(1) knowingly or intentionally makes or causes to be made a false statement or misrepresentation of a material fact:
          (A) on an application for a contract, benefit, or payment under the Medicaid program; or
          (B) that is intended to be used to determine its

27

eligibility for a benefit or payment under the Medicaid program.

(2)     knowingly or intentionally concealing or failing to disclose an event:

> (A) that the person knows affects the initial or continued right to a benefit or payment under the Medicaid program of.
>
> > (i)     the person, or
> >
> > (ii)    another person on whose behalf the person has applied for a benefit or payment or is receiving a benefit or payment; and
>
> (B) to permit a person to receive a benefit or payment that is not authorized or that is greater than the payment or benefit that is authorized;
>
> > * * *

(4)     knowingly or intentionally makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

> > * * *
>
> (B) information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5)     ... knowingly or intentionally charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or continued service to a Medicaid recipient if the cost of the service provided to the Medicaid recipient is paid for, in whole or in part, under the Medicaid program.

75.     Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas by their deliberate and systematic violation of federal and state laws, including the federal Anti-kickback Act and § 36.002, and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by the government-funded healthcare programs.

76.     The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' conduct paid the claims submitted by healthcare

providers and third party payers in connection therewith.

77.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes and regulations was also an express condition of payment of claims submitted to the State of Texas.

78.     Had the State of Texas known that Defendants were violating the federal and state laws cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the government-funded healthcare programs or were premised on false and/or misleading information, it would not have paid the claims submitted by healthcare providers and third party payers in connection with that conduct.

79.     As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

80.     Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

81.     Relator is a citizen of Texas with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

82.     This Court is requested to accept pendent jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests a trial by jury for all issues so triable, and for this Court to award the following damages to the following parties and against Defendants:

To the State of Texas:

 (1) Two times the amount of actual damages which the State of Texas has sustained as a result of Defendants' conduct;

 (2) A civil penalty of not less than $5,000 or more than $10,000 pursuant to V.T.C.A. Hum.. Res. Code § 36.052(a)(3)(b) for each false claim which Defendants cause to be presented to the State of Texas;

 (3) Prejudgment interest; and

 (4) All costs incurred in bringing this action.

To Relator:

 (1) The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

 (2) Reimbursement for reasonable expenses which Relators incurred in connection with this action;

 (3) An award of reasonable attorneys' fees and costs; and

 (4) Such further relief as this Court deems equitable and just.

## COUNT III - RETALIATION - 31 U.S.C. § 3730(h)

83. Relator repeats and realleges each allegation contained in paragraphs 1 through 16, 18, 22-23, and 28-31 above as if fully set forth herein.

84. Defendants have a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, testimony for, or assistance in an FCA action.

85. Relator took lawful actions in furtherance of a False Claims Act action, including but not limited to investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the False Claims Act and other laws.

86. In or about February 6, 2009, Defendant terminated Relator's employment.

87.     Relator was discriminated against in the terms and conditions of his employment by Defendant, by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the False Claims Act.

88.     The actions of Defendant damaged and will continue to damage Relator in violation of 31 U.S.C. § 3730(h), in an amount to be determined at trial.

89.     Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against Defendant, as follows:

(a)     For all proper damages in favor of Relator as a result of Defendant's in violation of 31 U.S.C. § 3730(h), including reinstatement with the same seniority status that Relator would have but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for all special damages sustained as a result of the discrimination including attorneys fees, costs and expenses.

(b)     Such other and further relief as this Court deems proper.

## COUNT IV - RETALIATION
## TEXAS MEDICAID FRAUD PREVENTION LAW (SECTION 36.115)

90.     Relator repeats and realleges each allegation contained in paragraphs 1 through16, 18, and 28-31 above as if fully set forth herein.

91.     Defendants have a duty under the V.T.C.A. Hum. Res. Code § 36.115 to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of an action brought under the Texas Medicaid Fraud Prevention Law, V.T.C.A. Hum. Res. Code § 36.001 et seq., including investigation for, testimony for, or assistance in such an action.

92.     Relator took lawful actions in furtherance of an action, under the Texas Medicaid

31

Fraud Prevention Law, V.T.C.A. Hum. Res. Code § 36.001 et seq., including but not limited to investigation for, testimony for, or assistance in an action filed under this section and, as such, engaged in protected activity under the Texas Medicaid Fraud Prevention Law, V.T.C.A. Hum. Res. Code § 36.001 et seq., and other laws.

93.    In or about February 6, 2009, Defendant terminated Relator's employment.

94.    Relator was discriminated against in the terms and conditions of his employment by Defendants, by and through its officers, agents, and employees because of lawful acts done by him in the furtherance of an action under the Texas Medicaid Fraud Prevention Law, V.T.C.A. Hum. Res. Code § 36.001 et seq.

95.    The actions of Defendants damaged and will continue to damage Relator in violation of V.T.C.A. Hum. Res. Code § 36.115, in an amount to be determined at trial.

96.    Pursuant to V.T.C.A. Hum. Res. Code § 36.115, Relator is entitled to litigation costs and reasonable attorneys' fees incurred in the vindication of his reputation and the pursuit of his retaliation claims.

97.    In violation of V.T.C.A Hum. Res. Code § 36.115, Defendants discharged the Relator because of lawful acts taken by the Relator in furtherance of an action under said subchapter, including investigation for, initiation of, testimony for, or assistance in an action filed under this subchapter.

WHEREFORE, Relator respectfully requests this Court to enter Judgment against Defendants, for reinstatement with the same seniority status that Relator would have had but for the discrimination; and not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

32

DATED this 23rd day of February 2009.

Respectfully Submitted,

Allena L. Guerra, Esq.
Texas Bar No.:24036319
Dilley Law Firm
9101 N. 23rd
McAllen, TX  78504
Telephone:(956) 566-3670
Fax: (956) 631-6330
994-8798

Of Counsel:
Kenneth J.  Nolan
Marcella Auerbach
Nolan Law Firm
435 N.  Andrews Ave., Suite 401
Fort Lauderdale, FL 33301
Phone: (954) 779-3943
Fax: (954) 779-3937

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing first amended complaint was sent via U.S. Mail on or about February 23, 2009 to the following:

Andrew A. Bobb
Assistant United States Attorney
Southern District of Texas
P.O. BOX 61129
Houston, Texas 77208

Michael F. Hertz
David Cohen
Attorneys, Department of Justice
Civil Division
P.O. Box 261
Ben Franklin Station
Washington, D.C. 20044

Susan J. Arenella
Assistant Attorney General
Office of the Texas Attoreny General
Civil Medicaid Fraud Division
P.O. Box 12548
Austin, TX 78711-2548

Allena Guerra, Esq.